508 F.Supp. 559 (1980)
UNITED STATES of America, Plaintiff,
Radonics Electronics, Inc., and Interstate Supply Co., et al., Intervenor-Plaintiffs,
v.
HOME LIFE INSURANCE COMPANY, Defendant.
No. 79-87C(3).
United States District Court, E. D. Missouri, E. D.
December 30, 1980.
Joseph B. Moore, Asst. U. S. Atty., St. Louis, Mo., for United States.
Frank Susman, St. Louis, Mo., for Joan and Brian Shirley.
Roger P. Bernhardt, Rebecca R. Kionka, St. Louis, Mo., for intervenor-plaintiffs Radonics Electronics, Inc. and Interstates Supply Co.
Richard J. Sheehan, Ira L. Blank, St. Louis, Mo., for Home Life Ins. Co.

MEMORANDUM
FILIPPINE, District Judge.
This is an action to recover the proceeds of a life insurance policy issued by the defendant, Home Life Insurance Co., Inc. (Home Life), for the life of John Shirley. Home Life defends on the ground that material misrepresentations were made by the insured in the application for the policy. A trial on the merits has been held. After consideration of the pleadings, the testimony and exhibits introduced at trial, and the stipulations and briefs filed by the parties, the Court hereby makes the following findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52:

FINDINGS OF FACT
Defendant, Home Life, is a duly organized and existing corporation with its principal place of business in the State of New York. At all times mentioned herein, Home Life was qualified to do business in the State of Missouri.
Plaintiff Radonics Electronics, Inc. is a Missouri corporation duly organized and existing under the laws of the State of Missouri and a citizen of the State of Missouri. Plaintiff Interstate Supply Co. is a Missouri corporation duly organized and existing under the laws of the State of Missouri and a citizen of the State of Missouri.
Metro Car Stereo/CB, Inc. (MC/CB) is a Missouri corporation which forfeited its charter on January 1, 1978. Joan Elinor Shirley is a citizen of the State of Missouri, residing in St. Louis County, Missouri, and is the sole surviving statutory trustee of MC/CB.
Joan Elinor Shirley is the widow of John Shirley, who died on March 7, 1978 at the age of 26. The couple were married in September, 1973. Their son, Brian, was born in 1974.
*560 In mid-1975, the family was living in the St. Louis, Missouri area. The marriage was not a happy one for Joan Shirley, and in June, 1975, the couple separated. Joan Shirley went to live with her parents, and James McGiverin, a friend of John Shirley's, moved in with John. On July 12, 1975, husband and wife spent the evening together; however, the next morning Joan Shirley told her husband that she was not ready for a reconciliation.
Sometime during the afternoon of July 13, 1975, John Shirley took 15 tablets of Sopor (Quaaludes). At approximately 6:00 p. m., Joan called to talk to him and Jim McGiverin answered. It appeared that John was asleep, because his bedroom door was locked and a note on the door said "Do not disturb. Much needed sleep." However, Joan asked McGiverin to wake her husband, and McGiverin picked the lock and entered the room. He found John in a conscious but groggy condition. McGiverin also found a brown plastic pill bottle. McGiverin called an ambulance, and John was taken to the emergency room of St. Anthony's Medical Center.
At the emergency room, John underwent a masogastric gavage by Rodolfo LaTorre, M.D. The treatment was very painful, as it involved the insertion of a plastic tube through the penis to remove the contents of the bladder. John was not admitted into the hospital, but left after the emergency room treatment. He later told his wife that the treatment had been very painful, and that he would never do anything like that again.
The 15 tablets taken by John Shirley constituted an overdose, but not a lethal dose. There was no evidence to indicate whether he believed he had taken a lethal dose or not.
John and Joan Shirley resumed living together around November 1, 1975.
In July, 1976, John Shirley needed a life insurance policy to secure a $45,000 loan which was to be guaranteed by the Small Business Administration, from the Tower Grove Bank to MC/CB, a corporation which John had started and of which he was sole stockholder. MC/CB was primarily engaged in the retail sale of car stereos and CB radios. On July 12, 1976, John applied for a life insurance policy from the defendant. The answer to the questions on Part II of the application were not written down by John; however, he signed Part II beneath a paragraph reading in part "I hereby declare that the above statements and answers are complete and true to the best of my knowledge and belief."
Question 10 on Part II of the application asked whether the applicant had ever had, or been told he had, or been treated for, a lengthy list of specific ailments and conditions. Question 11, which had four subparts, asked in relevant part: "(c) Have you ever been under observation or treatment in any clinic, hospital or sanitarium?" and "(d) Have you consulted, or been examined or treated by any physician or practitioner during the past 5 years for any reason not already stated?" The answer to question 10(c) was checked "No"; the answer to question 10(d) was checked "Yes." Question 12 asked for the details of each affirmative answer to any preceding question. As details for question 11(d), it was written that in 1972, John had been treated for "Kidney infection? and Px also for minor ailments," by Charles Burnside, M.D. Nowhere on the application was there any reference, direct or indirect, to the incident of July 13, 1975, in which John had been treated at St. Anthony's emergency room.
On or about July 22, 1976, John Shirley, acting in his capacity as President of MC/CB, executed an assignment from MC/CB, to Tower Grove Bank and Trust Company of all of the proceeds from the life insurance policy issued by the defendant on the life of John Shirley. On or about July 22, 1976, Tower Grove Bank and Trust Company assigned its interest in the proceeds of the life insurance company to the United States of America, Small Business Administration.
On or about October 4, 1976, life insurance Policy Number 987041D, in the face amount of $50,000.00, was issued by the defendant for the life of John Shirley. At *561 the time of issuance, the owner and beneficiary of the policy was MC/CB, which was a duly organized and existing Missouri corporation in good standing. Among the General Provisions in the policy were the following:
Statements in Application. All statements made by the insured shall, in the absence of fraud, be deemed representations and not warranties. No statement shall be used to void this policy or be used in defense to a claim under it unless contained in the application and unless a copy of that application is attached to the policy when issued.
* * * * * *
Incontestability. After this policy has been in force during the lifetime of the insured for a period of two years from its date of issue it will be incontestable except for non-payment of premiums and except as to any provision for disability benefits or for accidental death benefits issued as a part of this policy.
The policy also contained the provision "[t]his policy and the application, a copy of which is attached, constitute the entire contract." (A copy of the application for the policy was attached to the policy at the time of issuance.)
In early July, 1977, the insured and his wife separated again. Joan Shirley moved out of their home and leased an apartment in Fenton, Missouri. Joan resumed dating a man she had met during the first separation; the insured also began seeing other women. At some point prior to March 7, 1978, Joan filed for divorce, and the insured provided her the money to do so.
In November, 1977, the insured began dating Susan Hirth, whom he met while she was a customer at MC/CB. They saw each other once or twice a week. Sometime in January, 1978, Susan Hirth decided to break the relationship off and the insured was aware of her decision. He called her on the phone and told her he had taken poison. However, when she agreed to continue to see him, he said he would have himself taken care of. (There was no evidence that the insured actually took poison or an antidote on this occasion.) The insured told Susan Hirth at some point that he wanted to marry her.
Jim McGiverin had moved in with the insured again when Joan Shirley moved out in July, 1977. In February, 1978, the insured told McGiverin that Susan Hirth would be moving in and that McGiverin would have to move out. On or about March 1, 1978, McGiverin did move out. However, Susan Hirth did not move in. In fact, Susan Hirth had been refusing to see the insured with their accustomed frequency and the insured had been depressed and unusually quiet in the first week of March.
On the morning of March 6, 1978, the insured brought Susan Hirth one red rose at her place of work and asked if he could call her that evening after work. She said yes, and he did call her at approximately 5:30 p. m. He asked her then if she wanted to break their relationship off. She said yes, and added that she was sure of her feeling. He replied that she wouldn't have to worry about his bothering her anymore.
Sometime during the morning or afternoon of March 7, 1978, the insured committed suicide in the bedroom of his residence by shooting himself in the right side of his head with his 44 Magnum.
A police officer who investigated the insured's home after the suicide found approximately 45 bills and past due notices. MC/CB's store had been closed on January 10, 1980, but as of June 30, 1980, MC/CB still owed over $35,000.00 in principal on the loan from the Tower Grove Bank. At some point in late 1977 or early 1978, the insured and an associate, Richard Davis, had started a new company, Advanced Marketing Concepts. The new corporation, at the time of the insured's suicide, was running out of cash and was not sufficiently solvent to meet its normal operating expenses.
During the period when he lived with Joan, the insured smoked heavily. However, he used alcohol very moderately and did not use drugs at all. He was not a moody individual, although he tended to be very nervous. He did not have a large *562 circle of friends, and he was somewhat aloof even with those who were close to him. His business was his chief interest, and he often stayed up late at night to work on it after returning from MC/CB at 9:30 or 10:00 p. m.
The testimony of defendant's expert witness, Dr. George E. Murphy, established that approximately one-third of completed suicides are committed by persons who have made a previous "suicide attempt." A "suicide attempt" is not necessarily an act which is calculated to end one's life; it is any self-destructive act which, for example, induces tissue injury or involves the ingestion of a drug overdose. A "suicide attempt" may be made with the goal of communicating one's distress to others and causing others to intervene in some way.
One to two per cent of those who have made a "suicide attempt" complete suicide within one year of the attempt; and an additional one per cent complete suicide in each of the following nine or ten years, so that a total of 10-12 per cent of "suicide-attempters" complete suicide within 10 or 11 years of the attempt. Those who have made a "suicide attempt" are 100 times greater risks of completing suicides than the general public. The majority of suicides suffer from depression; approximately one-quarter are alcoholics.
The insured's action of July 13, 1975, was a "suicide attempt" even though the insured may have known that the 15 tablets he ingested were not a lethal dose. The insured was, for the most part, a very rational man. However, he lacked a certain depth of emotional stability, such that a breakup with the woman in his life could cause him to perform self-destructive acts. This lack of emotional stability contributed to his death by suicide.
Thus the failure of the application to disclose the treatment by Dr. LaTorre on July 13, 1975, in answer to Question 12, as to the details of Question 11(d) concerning treatment by a doctor, in effect constituted a misrepresentation of the insured's degree of emotional stability. It is true that there were no questions on the application asking whether the applicant had ever attempted to commit suicide.[*] Nonetheless, where an applicant had committed self-damaging acts of such severity that he had required treatment by a doctor, or treatment or observation in a clinic, hospital, or sanitarium, such fact would surface on the completed application form and would inform the defendant that the applicant was prone to such acts. John Shirley's application did not reveal that fact, and, in view of the testimony of Dr. Murphy, it cannot be doubted that such a fact was material.
The Court does not find that the answer written for Question 11(c) was a misrepresentation, however, because the insured was not actually admitted to any hospital, but was only treated in the emergency room. In common parlance there is a distinction between "[being] under ... treatment in [a] clinic [or] hospital" and going to an emergency room for treatment.
Resuming the narrative of events surrounding the insured's death, the Court further finds that on January 1, 1978, MC/CB, forfeited its corporate charter for failure to file its annual report and antitrust affidavit for 1977. Upon the aforesaid forfeiture of the charter, statutory trustees of the corporation were John Shirley and his wife, Joan Shirley.
At the special instance and request of MC/CB, plaintiff Radonics Electronics, Inc. had sold and delivered to MC/CB, certain goods and merchandise. The value and price of said goods and merchandise was in excess of Twenty-Five Thousand Dollars ($25,000.00). No part of said Twenty-Five Thousand Dollars ($25,000.00) has been paid and there is now due, owing and unpaid from MC/CB to plaintiff Radonics Electronics, Inc. a sum in excess of Twenty-Five Thousand Dollars ($25,000.00). At some time following January 1, 1978, and after the death of John Shirley, Joan Shirley, in *563 her capacity as the sole surviving statutory trustee of MC/CB, executed an assignment to plaintiff Radonics Electronics, Inc. and/or plaintiff Interstate Supply Co. of all right, title and interest of MC/CB in and to certain of the proceeds under the policy. (The validity of said assignment is disputed in this case.)
On May 2, 1978, the Internal Revenue Service of the United States of America filed a Notice of Levy against MC/CB pursuant to which notice, the Internal Revenue Service claims some portion of the policy proceeds, should the defendant be adjudged liable for the payment thereof.
On or about September 25, 1978, the defendant tendered by check made payable to the Internal Revenue Service, to The Small Business Administration, and to counsel for plaintiff Radonics Electronics, Inc. and plaintiff Interstate Supply Co., refund in full of all premiums paid on the policy of insurance issued to John Shirley.
The Internal Revenue Service returned the aforesaid check to the defendant with a demand that a new check issue, made payable solely to the Internal Revenue Service.

CONCLUSIONS OF LAW
The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1345.
As noted above, the sole defense in this action is that the insured made a material misrepresentation on the application for the life insurance policy the proceeds of which are at issue. Defendant does not contend that the insured intended to commit suicide at the time he applied for the policy.
Section 376.580, R.S.Mo. (1968) provides as follows:
No misrepresentation made in obtaining or securing a policy of insurance on the life or lives of any person or persons, citizens of this state, shall be deemed material, or render the policy void, unless the matter misrepresented shall have actually contributed to the contingency or event on which the policy is to become due and payable, and whether it so contributed in any case shall be a question for the jury.
In light of the factual findings made above, the Court concludes that the "matter misrepresented," i. e., the emotional instability that led the insured to ingest 15 tablets of Sopor and thus to be treated by a doctor on July 13, 1975, actually contributed to the contingency or event on which the policy became due and payable. The parties have not called to the Court's attention any case in which a similar issue was presented; however, the Missouri statute which governs this case provides that the issue of "actual contribution" is an issue to be determined by the trier of fact, and this Court has found "actual contribution" as a matter of fact.
Plaintiff United States of America has cited Cohen v. Metropolitan Life Insurance Company, 444 S.W.2d 498 (Mo.App.1969) for the proposition that defendant must also prove the insured's intent to deceive in order to prevail. Cohen relied on Toler v. Missouri Ins. Co., 243 S.W.2d 788 (Mo.App. 1951) for the factual elements which constituted "the legal equivalent" of fraudulent intent: "that material misrepresentations were made; that they were false; that insured knew they were incorporated in the applications when he signed them and that he knew they were false." 243 S.W.2d at 791.
In Toler, the jury had found for the defendant. The Court of Appeals affirmed the trial court's grant of a new trial because of error in the following instruction:
[T]he terms "Fraud," "Fraudulent" and "Fraudulently," as that term is used in these instructions, does not require a finding that the insured, ... at the time he signed either part of the application for the policy in suit gave false answers to questions regarding his health with the deliberate intent and purpose of deceiving the defendant or its agents, but it is sufficient for a finding of "fraud" that you find by a preponderance or greater weight of the evidence that the application contained a misstatement of fact or facts within the insured's personal knowledge at the time he signed either part of said application.
*564 The application contained at least four false answers. The insured had signed the application; however, plaintiff's evidence was that the insured had signed without reading the contents of the application, and that the insured's answers had not been faithfully transcribed by the agent who was filling in the form. The Court of Appeals held that the instruction was erroneous because it would have been possible for the jury to find for the defendant because of a misstatement within the insured's personal knowledge at the time the application was signed even though the insured did not know the contents of the application. The Court stated that
"Where the insured at the time of applying for a policy of insurance truthfully states to the agent the facts pertaining to the risk and the agent inserts in the application mistaken or intentionally false statements the insurer cannot set up such misstatements in avoidance of the policy ... and this rule applies to cases in which the insured signed the application without reading it, unless he is guilty of collusion with the agent."
243 S.W.2d at 792-93 (citations omitted).
In Cohen, supra, on which plaintiff relies, a trial to the court had resulted in a verdict for the plaintiff on a family medical expenses policy. There was evidence from which the following facts could have been found: the plaintiff had signed the insurance application "as true and complete;" that plaintiff did not read the entire application before signing it; that the insurance agent had not read the questions literally to the plaintiff; that plaintiff had in fact been psychoanalyzed by a doctor but that the answers on the application failed to disclose that fact; and that the plaintiff's sons' hospital expenses, which the plaintiff sought to recover by the suit, bore no relation to the misrepresentation concerning plaintiff's psychoanalysis. The trial court had found, inter alia, that neither plaintiff nor her sons had made "any material misrepresentations or fraudulent answers to defendant's agent at the time" of application for the policy. The Cohen court found that the findings made by the trial court were not clearly erroneous on the issue of material misrepresentations, and affirmed the trial court in relevant part. Obviously, the fact that there was no relationship between the alleged misrepresentation as to plaintiff's psychoanalysis and the plaintiff's sons' hospitalization provided sufficient basis for the appellate court's affirmance on this issue.
This Court finds that neither Toler nor Cohen provides the rule applicable to this case with respect to the issue of the insured's knowledge of the contents of the application, for there has been no allegation or suggestion of evidence that the answers contained in John Shirley's application were not provided by the insured himself, nor has there been any suggestion that the insured was not provided the opportunity of reading the application before signing. In the absence of any such allegations, the Court finds that the rule applies that the insured "is bound in law to have known the contents of the instrument [he] signed, whether he read it or not." Haman v. Pyramid Life Insurance Company, 347 S.W.2d 449, 454 (Mo.App.1961); 17 Appleman Insurance Law and Practice § 9405 (1945 & Supp. 1979); Miller v. Plains Insurance Company, 409 S.W.2d 770 (Mo.App.1966). Accordingly, the Court finds that the insured's intent to deceive is sufficiently established by his signature on the application, which contained a material misrepresentation which was within the insured's knowledge at the time he signed the application.
It follows that the insurance policy was void ab initio and judgment will be entered for defendant in this matter on plaintiffs' complaints.
Defendant has counterclaimed for a declaration that the policy was void ab initio and that no benefits are due under the policy. The Court will enter judgment for defendant on both points. Defendant further prays for a declaration that the refund of the premiums paid on the policy, which amounted to $266.49 and which the defendant has deposited into the registry of the Court, fulfills defendant's legal obligations *565 in connection with the policy, and the Court will so declare.
Defendant also prays the Court to declare to whom the refunded premiums are due and payable. The parties have not displayed great interest in this issue. The Court finds that, as MC/CB was the owner of the policy and presumably paid the premiums thereon, it would be entitled to the refund, State v. Allen, 337 Mo. 770, 85 S.W.2d 886 (1935), were it not for the levy served upon defendant by the Internal Revenue Service. The Court finds that the Internal Revenue Service is entitled to the refund, pursuant to the notice of levy.
The defendant has not cited any authority in support of its prayer for attorneys' fees and the prayer will be denied.
It follows from all of the foregoing that Count II of defendant's counterclaim, relating to apportionment of the policy proceeds in case defendant was held liable on the policy, must be denied and dismissed as moot.
NOTES
[*] The application did ask whether the applicant had ever had, been told he had, or been treated for "anxiety, tension or nervous breakdown," to which John Shirley had replied negatively. Defendant has abandoned its claim that this answer was false.